UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| SAFT AMERICA, INC.,<br><br>　　　Plaintiff,<br><br>vs.<br><br>PRECISION DRAWN METALS, INC.,<br><br>　　　Defendant-Third Party Plaintiff,<br><br>vs.<br><br>THOMAS STEEL STRIP<br>CORPORATION,<br><br>　　　Third-Party Defendant. | CASE NO. 3:21CV35 |

**DEFENDANT PRECISION DRAWN METALS, INC.'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

　　　Defendant Precision Drawn Metals, Inc. (hereinafter referred to as "PDM"), has moved this court for summary judgment, specifically requesting a finding that the evidence presented to date does not support a finding that PDM breached its contract with Saft and therefore Saft's sole claim sounding in breach of contract should be dismissed. In the alternative only, if the breach of contract claim is not dismissed, PDM has requested a finding that Saft's damages are limited by the warranty language in the contract, and any damages Saft is entitled to should be limited to the cost of replacement of the claimed "non-conforming" cans.

　　　In response, Saft argues a change in the annealing process by TSSC caused the cans to be defective, and that genuine issues of material fact exist regarding whether the cans met Saft's specifications, and whether a 2013 version of Saft's terms and conditions apply. As none of

these arguments are persuasive, and as Saft completely fails to address the fact that all of its other drawings specified the required annealing process while the drawing for the LM17130 can at issue did not until Saft onboarded H&T and changed its drawing, PDM is entitled to judgment as a matter of law. In the alternative only, while Saft claims it can seek any damages it chooses based upon section 10.7 of the applicable warranty provision, that is not a correct reading of the language of the contract and should be rejected.

I.   **RESPONSE TO SAFT'S PROPOSED FACTS**

While Saft does not dispute many of the facts established by PDM in its brief, it proposes additional facts in support of its brief which are not accurate and which have no support in the available evidence.  First, Saft claims PDM is "engaged in the business of designing . . . metal . . parts for customers."  However, as clearly established in PDM's brief and the evidence submitted in support, PDM is a a manufacturer of parts and has never designed parts for its customers. (*see*, Dkt. 88, ¶10)

Second, while Saft claims PDM "ensured that its cans were suited for their intended use" and were "suited to be used for the tasks and in the manner intended," nowhere in their brief does Saft claim PDM had any knowledge or information concerning Saft's "intended use" other than as a generic battery cell. (*see*, Dkt. 91, ¶23)  In fact, other than the drawing provided to PDM, Saft provided no other information to PDM about the assembly process or the end product.

Third, both parties acknowledge PDM has been supplying Saft with metal cans for some time and that the issues which form the basis of this action did not arise until 2018.  Moreover, Saft admits in its submissions that "PDM accepted the terms of each purchase order by sending electronic order acknowledgements and by supplying Saft with the various quantities of steel

cans as set forth in the purchase orders." (*see,* Dkt. 88, p. 4) As noted in Saft's own initial pleading, it alleged ten (10) particular purchase orders are at issue in this case, ranging from 2018 through 2020, and that PDM accepted those purchase orders, along with the terms and conditions set forth therein. (*see*, Dkt. 1, ¶¶9-11) In fact, Saft attached to its original complaint the ten purchase orders it contends are at issue in this case. (*Id*., Exh. 1, pp. 11-40) It is simply beyond dispute that nowhere in those purchase orders does Saft incorporate or even refer to any other terms and conditions other than those set forth on the purchase orders themselves. Therefore, any argument by Saft that other terms and conditions apply, including earlier 'Standard Terms and Conditions" used by Saft years ago, must be rejected, despite Saft's claims that PDM never disclaimed these earlier terms and conditions. As Saft drafted its own purchase orders, Saft must be held to the language stated therein and cannot rely upon different or earlier language for purposes of this action.

Fourth, while Saft admits it complied with the applicable "General Terms and Conditions" set forth in the purchase orders regarding rusty cans by notifying PDM of the issue and returning the cans to PDM for inspection and replacement, Saft admits it did not follow the same procedure regarding cans that were leaking and/or cracking. Although there is no dispute Saft notified PDM of the issue, Saft merely requested PDM to provide information about its steel supplier and never took advantage of any of its remedies as set forth in its own terms and conditions. (*see*, Dkt. 91, ¶¶37-38) Instead, Saft filed this lawsuit seeking damages.

Fifth, while Saft is critical of PDM because of changes made by TSSC and not PDM in the annealing process (changes which PDM could not have known about), Saft does not dispute that for the entire period of time PDM manufactured cans for Saft, Saft, the owner of the drawing in question, never specified the required annealing process on its own drawing for the LM17130

can. (*see*, Dkt. 90, ¶¶19, 60) It was only after this issue arose that Saft decide to replace PDM with H&T and include in its drawing for the LM17130 can the specified annealing process. Yet now, through this action, Saft wants to hold PDM financially responsible for a change in the annealing process which PDM never authorized; had no knowledge of; and for which Saft never provided any such specifications and/or end-use performance criteria.

Sixth, while Saft now claims, based upon a report by its own retained expert, that the cracking and leaking was the result of the change in the annealing process, Saft cannot dispute that up until this lawsuit was filed and its expert retained, no one at Saft, or anyone on Saft's behalf, had conclusively determined the cause of the cracking and/or leaking was due to the annealing process. In addition, while Saft's expert claims the issues were solely related to the change in the annealing process, Saft cannot conclusively establish that PDM failed to meet Saft's specifications as set forth in its drawing for the LM17130 and/or through the PPAP process. In fact, Dan Grice of Materials Evaluation & Engineering, Inc. ("MEE") opined that PDM had met all required specifications provided to it by Saft, while Saft's expert completely fails to address that particular issue. (*see*, Crooks Decl, Exh. A; see also, Dkt. 96-1)

Moreover, while Saft argues, based upon its own expert report, that "changing the annealing process from CCA to CSA created a well-known and well-recognized problem in electroplated steel known as hydrogen-induced cracking" (Dkt. 88, p. 2) Saft fails to identify to whom this "well-known and well-recognized" issue was known. Moreover, if this issue, according to Saft, was so well-known and so well-recognized, Saft fails to explain, or even address, why Saft failed to specify the required annealing process for the LM 17130 can on its own design drawing as it had for its other cans. If Saft now claims the change in the annealing process was the issue, had Saft simply included on its drawing the specified annealing process,

as it did on its other cans, the cracking and leaking would have been avoided. Instead, despite the fact that Saft failed to specify the annealing process until it onboarded H&T, it now seeks to hold PDM responsible for all of its damages related thereto.

Finally, while Saft sets forth its alleged claimed damages in its brief (*see* Dkt. 88, pp. 9-10), Saft fails to provide an explanation why it scrapped cans as opposed to return them to PDM for a full refund and/or repair or replacement. In addition, while Saft sets forth other damages which it claims are related to this matter, Saft has provided zero evidence in support of those additional damages. The only "evidence" Saft provides is its own itemization of damages submitted during the course of this litigation, which is based upon an excel spreadsheet of claimed damages that has no documentary support in the record and therefore are unverifiable. (*see*, Crooks Decl, Exh. B)

## II.   LAW AND ARGUMENT

1. <u>No Genuine Issue of Fact Exists Regarding the Applicable Terms and Conditions</u>

While the parties appear to agree on the applicable standards on summary judgment, the parties disagree on the applicable terms and conditions which govern this action. As demonstrated in PDM's initial brief, and not disputed by Saft, the purchase orders at issue in this case were drafted by Saft and sent by Saft to PDM during the time period at issue in this case to govern the relationship between Saft and PDM. (*see*, Dkt. 66, ¶23)

The interpretation and application of a contract to undisputed facts present a question of law for the court's determination. *See, Osborn v. Dennison*, 2009 WI 72, ¶ 33, 318 Wis.2d 716, 768 N.W.2d 20. The primary goal in contract interpretation is to "give effect to the parties' intent, as expressed in the contractual language." *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis.2d 1, 676 N.W.2d 426. Wisconsin courts interpret the language "consistent

with what a reasonable person would understand the words to mean under the circumstances." *Id.*

When the terms of a contract are clear and unambiguous, courts will construe the contract according to its literal terms." *Gorton v. Hostak, Henzl & Bichler*, *S.C.,* 217 Wis.2d 493, 506, 577 N.W.2d 617 (1998). When the contract language is ambiguous, however, courts will interpret the contract against the drafter. *See, Seitzinger, supra*, 270 Wis.2d 1, ¶ 22, 676 N.W.2d 426.

As noted in PDM's initial brief, there is no issue of material fact, genuine or otherwise, concerning the applicable terms and conditions governing the relationship between Saft and PDM in 2018 through 2020, the time period at issue in this case. (*see*, Dkt. 90, ¶23) As the language of the terms and conditions set forth on the purchase orders attached to Saft's complaint clearly state, the purchase orders are "subject to and shall be governed by the Terms and Conditions printed on the reverse hereof." (*see*, Dkt. 1, Exh. 1, pp. 12-14)  Additional, at the top of the second page, under Section 1 entitled "General," section 1.1 reads "These General Terms and Conditions of Purchase apply to Orders and purchases of Supplies made by Saft from supplier, and under Section 2 entitled "Definitions," section 2.1 reads ""General Terms and Conditions" *refers to these* General Terms and Conditions of Purchase.   (*Id.*).

While Saft now alleges other earlier terms and conditions titled "Saft America, Inc. Standard Terms and Conditions of Purchase" dated March 2013, apply, Saft has failed to provide sufficient evidence in support of that claim.  While Saft purports to support its contention with an affidavit of one of its employees, Mr. John Powell (Dkt. 95), wherein he claims he recalls sending emails in 2013 to PDM with a document entitled "Saft's Standard Terms and Conditions," nowhere in his affidavit does he explain how or why those terms and conditions

apply to purchase orders dated 2018 through 2020, especially when each of those purchase orders contains the applicable terms and conditions of those particular sales and nowhere in those documents are any other terms and conditions referred to or incorporated therein.

Based upon the clear and ambiguous language of Saft's own purchase orders and the General Terms and Conditions of Purchase contained therein, there can be no question those are the exclusive terms and conditions applicable to this matter and upon which Saft may rely. However, if Saft now claims there is an ambiguity in its own language, any such ambiguity must be interpreted in favor of PDM and against Saft. *See, Seitzinger, supra*, 270 Wis.2d 1, ¶ 22, 676 N.W.2d 426. As it cannot be disputed the only applicable terms and conditions are those set forth in the 2018 - 2020 purchase orders attached to Saft's complaint, no choice of law or other provision contained within other terms and conditions previously utilized by Saft are applicable in this case and need not be discussed herein.

2. <u>No Genuine Issue of Material Fact Exists Regarding Saft's Breach of Warranty Claim</u>

Despite Saft's claims to the contrary, nothing in the evidence produced to date by Saft demonstrates PDM failed to do what it undertook to do in the purchase orders discussed above, as PDM provided Saft with a metal can that met the generic specifications provided to PDM by Saft. (See, Crooks Decl, Exh. A) Stated otherwise, Saft has produced no evidence in this case that any of the cans provided to Saft did not meet Saft's own specifications. While Saft claims the cans supplied by PDM were defective and not suitable for use as battery cells because they cracked and leaked due to an improper annealing process, again Saft fails to provide this court

with any evidence whatsoever that it included a specified annealing process on its drawing.[1] How could PDM be held responsible for a standard for which Saft never specified?

In fact, nowhere in their submissions does Saft dispute that the annealing process was specified by Saft in its drawings for other cans, yet not added to the LM17130 drawing until after PDM was replaced by H&T. (see, Dkt. 90, ¶¶60, 67) While Saft argues that fact is immaterial and that PDM should have known which annealing process should be utilized, that argument stands in contrast to PDM's contractual role in this matter to create a can that complies with Saft's specifications. As noted by Dan Grice of MEE, PDM did comply with Saft's specifications. (see, Crooks Decl., Exh. A, pp. 2-3) However, PDM could not comply with a specification that was not included on the drawing, specifically the annealing process to be utilized on the metal used in the cans, and PDM had no way to verify the annealing process utilized by TSSC. (see, Dkt. 90, ¶56) Therefore, PDM cannot now be found in breach of warranty for failing to comply with a specification that did not exist.

This concept is supported by the principles underlying the *Spearin* doctrine, a doctrine that has been adopted in Wisconsin. *See, Bentley v State*, 73 Wis. 416, 41 N.W. 338, 342 (1889). Under *Spearin* and *Bentley*, because PDM was contractually bound to create the metal can according to the specifications provided to it by Saft in the form of the LM17130 drawing, if any issues arise as a result of that drawing, or any deficiencies therein, PDM cannot be held responsible for those deficiencies. Rather, the responsibility for the deficiencies lie with the party that created the drawing, herein Saft, which deficiency, according to Saft (i.e. a change in the annealing process) led to the cracking/leaking issue. Stated otherwise, Saft created an

---

[1] While Saft also raises issues concerning burrs and rust, PDM was notified of the rust, took action, and provided a credit to Saft. Saft never rejected cans from PDM based upon alleged burrs and, as noted in Saft's own documents, Saft only identified one can with a burr.

implied warranty that if the drawing for the LM17130 can was followed by PDM, the result would be as Saft intended and adequate for its use.  Again, PDM followed Saft's drawing for the LM17130, and since no annealing process was ever specified by Saft to PDM, any deficiency that Saft now claims resulted as a consequence must lie with Saft and not PDM.

While Saft claims the doctrine has no application to this case, Saft's reasoning is flawed, at best.  First, while Saft incorrectly argues "PDM was not misled by some error in Saft's specifications" and that it was "PDM's role to specify the annealing process," again the parties do not dispute that PDM does not design parts.  It merely manufacturers them.  If Saft required a specific annealing process, which it did in its other drawings for other cans, that process should have been include in its specification.  In fact, Saft has acknowledged that a specific annealing process was added to the LM17130 drawing once H&T replaced PDM as the supplier for the can.  Therefore, the evidence supports a conclusion that PDM was misled by Saft for relying upon the drawing for the LM17130 which failed to specify a particular annealing process which, according to Saft, led to the issues in this case.

Second, while Saft argues the doctrine cannot apply because PDM expressly warranted against defects, the only defect which Saft now contends led to it incurring substantial damages was the change to the annealing process, a change that was made by TSSC; a change which PDM was not informed of and did not receive confirmation of from TSSC until this lawsuit was filed; and a change which PDM did not authorize.  In fact, Saft has conceded that at no time during the relevant period of time did PDM change any of its processes in manufacturing the can. (*see*, Dkt. 90, ¶34) If the drawing for the LM17130 can did not specify an annealing process, and PDM continued to manufacture the can without any change to its manufacturing process, how can PDM be held liable for expressly warranting against defects specifically related

to the annealing process? Stated otherwise, PDM could not expressly warrant against defects related to the annealing process if PDM was never provided any specification to follow regarding the annealing process.

Third, and specifically related to the above, while Saft argues the *Spearin* doctrine cannot apply because PDM did not comply with Saft's specifications, the only issue which Saft and its expert claims led to the cracking/leaking issue was the annealing process, which was never included in Saft's specifications for the LM17130 until PDM was replaced by H&T. Therefore, Saft's argument that PDM did not comply with a specification that never existed cannot possibly defeat the application of the *Spearin* doctrine.

While Saft also argues in its brief that PDM did not comply with Saft's drawing because Saft's drawing required a #5 temper, Saft fails to acknowledge that through the PPAP process with PDM early on, Saft approved of either a #4 or #5 temper. (See, Dkt. 97-5, pp. 18-21; Dkt. 67-2, pp. 16-17) As noted in PDM's initial brief, if any changes or modifications are made based upon the drawing itself, PDM issues a PPAP to Saft for approval of any such modifications, which then become part of the specifications for the LM17130 can. (*see*, Dkt. 90, ¶11) For purposes of this action and the LM17130 can, all changes to the can through the PPAP process (other than any change related to the annealing process), including the change noted above, were approved by Saft. (*Id.*, 12) Saft cannot now claim that those changes were in breach of its warranty provision.

Finally, while Saft cites to case law in support of its flawed position on the *Spearin* doctrine, none of those cases provide any precedential authority for this court, as each case was issued from a foreign jurisdiction, including Maryland and North Carolina. Therefore, those cases should not be considered by this court.

As noted above and in PDM's initial brief, any consequences that resulted to Saft's battery assembly from a change in the annealing process are consequences that should be borne by Saft alone, the designer of the part, and Saft's sole claim against PDM sounding in breach of contract should fail.

3. <u>Saft Has Waived its Right to Seek Any Remedies from PDM</u>

While the issues related to Saft's damages need not be considered if the court finds no genuine issues of material fact regarding the breach of contract claim, the arguments concerning Saft's damages are equally flawed. As noted in PDM's initial brief, the warranty provision in Section 10 of the contract between PDM and Saft is unambiguous and its intent is perfectly clear. The parties agreed upon an acceptable method of resolving any issues concerning claimed non-conforming and/or defective cans - - Saft could either return the parts for a full refund or require repair and replacement of the cans within a year of receipt. Those were the options Saft provided itself regarding any claimed defective cans.

However, Saft failed to take advantage of either remedy. Instead of returning the cans to PDM for repair, replacement or refund, Saft scrapped all of the cans it claimed were "nonconforming and/or defective" and is now looking to PDM to not only compensate it for its entire cost of those scrapped cans, but is also looking to PDM for additional damages in the form of compensatory, incidental, and consequential damages and its reasonable attorneys' fees and costs incurred, none of which Saft is entitled to under its own contractual language.

When sophisticated parties are able to bargain, it is rarely unfair to hold them to their contract. *See, i.e., Southern Financial Group, LLC v. McFarland State Bank*, 763 F.3d 735 (7th Cir. 2014). It is beyond dispute that both Saft and PDM are sophisticate, commercial parties. Therefore, they should be held to the language of the contract between them. Moreover,

Wisconsin permits the parties to agree to limit remedies for breach of contract. *See, Murray v. Holiday Rambler, Inc*., 83 Wis.2d 406, 265 N.W.2d 513, 519–20 (1978) That is exactly what Saft decided to do - it agreed to limit its remedies for breach of contract to those set forth in Section 10 of the its General Terms and Conditions. These types of provisions are consistent with Wis. Stat. §409.719(1)(a), which permits parties to negotiate agreements which provide for remedies in addition to or in substitution for those provided in Wisconsin's Uniform Commercial Code, including limiting a buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts. Also consistent with Wis. Stat. §409.719(1)(b), of the remedies set forth in the contract, none are deemed to be exclusive. In other words, Saft could resort to any of the remedies set forth therein.

While Saft followed its own applicable terms and conditions by notifying PDM of the issues experienced with rust. In response, and consistent with the applicable terms and conditions, PDM sent representatives to Saft in 2019 to sort through the cans supplied, removed rusted cans and provided Saft with a credit towards future cans. However, the same process was not utilized by Saft regarding the claimed leaking and cracking cans. Again, while Saft did notify PDM of the issue, Saft never requested a refund and merely requested information about PDM's suppliers. While Saft argues otherwise, the evidence upon which Saft relies is related only to the rust issue and not the leaking/cracking issue. (*see, i.e.* Dkt. 90, ¶68, including SAFTEMAIL 7565-67 which is an internal Saft email and not communication with PDM; SAFT924-927, dealing with rust issues, amount of scrap, and no mention of any request to repair, replace or refund; and PDM 2251 and 4157, dealing with rust issues) In fact, Saft has yet to provide this court with any evidence that Saft complied with its own warranty obligation by

requesting a refund, repair or replacement of the cracking/leaking cans.  Instead, Saft simply scrapped the cans and now seek reimbursement for those costs.

In support of its position that Saft is not limited to the remedies it included in its own contract with PDM, Saft cites *Boulet v. National Presto Indus., Inc.,* an unreported case from 2012 (2012 WL 12996297), which is distinguishable from this case in many ways.  First, the issues were raised in a motion to dismiss pursuant to FRCP 12(b)(6), which applicable standards differ from those on summary judgment, including accepting as true all allegations set forth in the non-moving party's pleading. Second, the factual allegations are distinguishable, as the case involved a corporate defendant representing to an individual plaintiff (and others), as opposed to a contract between two sophisticated commercial parties, that its product had certain features that it did not actually have, and plaintiff relied on these representations to his detriment.  Third, and most importantly for this discussion, while Saft cites to certain language from the opinion concerning contractually remedies, this language is merely *dicta*, as the court never rendered any type of decision on the issue.  In fact, the court clearly states neither the defendant nor the plaintiff addressed the matter of exclusivity of remedies.  *Id.*, *9.  Therefore, the court simply concluded because it was the defendant who raised the limited warranty as a potential bar to the plaintiff's breach of express warranty claim, the defendant had the burden on this argument, failed to meet that burden and therefore the motion to dismiss on the issue was denied.  *Id.*[2]

Despite a lack of authority to support Saft's position, Saft argues that even if its remedies were limited, Saft could not be limited to repair/refund/replacement, as any such remedy would

---

[2] While Saft also cites to *Cernohorsky v. Northern Liquid Gas Co*., 268 Wis. 586, 592-593 (Wis. 1955), there is no discussion in that case concerning contractual remedies.  That case was an action by individual plaintiffs against a corporate defendant for injuries sustained as a result of a propane gas explosion, and analyzed issues of proper notice, the division of liability between co-defendants, and the principle of contribution.  Moreover, as all of the other cases cited by Saft in its brief are not controlling precedent for this court, they need not be discussed and/or distinguished from the facts of the pending action.

fail of its essential purpose. Saft's bases this argument on its contention that Saft provided PDM with a "reasonable opportunity to correct the defect(s) but PDM failed to do so." (Dkt. 88, p. 22) However, as noted above, and as Saft consistently resorts to in its brief, Saft attempts to intermingle the rust issue with the cracking/leaking issue. Concerning the former, as discussed above, PDM was notified of the issue, took steps to remove all cans with rust; and provided Saft with a credit/refund for those cans. Concerning the latter, PDM was never afforded the opportunity to provide a credit or refund or to repair or replace the parts. As noted above, Saft simply requested PDM to provide information concerning its steel supplier, TSSC, and never requested any other type of remedy. Instead, Saft waited until it filed this lawsuit to seek any remedies from PDM which, under the case cited by Saft in its own brief, *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, cannot be considered "a reasonable time after a defect is discovered."

As Saft's own warranty provision required it to either seek a refund and/or repair or replacement of any claimed non-conforming parts, and as Saft simply scrapped the cans at issue and did not seek a refund or repair and replacement, it cannot now seek remedies from PDM over and above what it is entitled to under that provision. Therefore, Saft should be limited as a matter of law to a refund of all parts it claims were "non-compliant," which would amount to 353,041 cans at approximately $0.11 a can, or $38,834.51.

### III.   CONCLUSION

Based on the foregoing, it is undisputed PDM met all specifications related to the can provided to it by Saft. The only specification which Saft claims PDM did not comply with, which it now claims led to the cracking and leaking of the cans, was a specification regarding the required annealing process. While it is undisputed a specification concerning the required annealing

process was included in Saft's other drawings for other parts, it is also undisputed it was not included on the LM17130 drawing until after PDM was replaced by H&T. Therefore, Saft's claim sounding in breach of contract, and specifically the breach of warranty provision, must fail. In the alternative only, if the breach of contract claim is not dismissed, pursuant to the language of the contract between PDM and Saft, Saft should be limited to its own warranty provision of refund of the cans in question, which would amount to approximately $38,834.51.

Respectfully submitted this 16th day of June, 2022.

> von BRIESEN & ROPER, S.C.
> Attorneys for Defendant
> Precision Drawn Metals, Inc.
>
> By: */s/ Michael P. Crooks*
> Michael P. Crooks
> State Bar No. 01008918

P.O. ADDRESS:
10 East Doty Street, Suite 900
Madison, WI 53703
(608) 287-3926
mcrooks@vonbriesen.com