IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

SAFT AMERICA, INC.

                Plaintiff,

v.                                                  OPINION and ORDER

PRECISION DRAWN METALS, INC. and ACUITY,           21-cv-35-jdp

                Defendants,

---

For nearly 20 years, plaintiff Saft America, Inc. bought steel cans from defendant Precision Drawn Metals, Inc. for use in making batteries. The relationship went south in 2018 and 2019, when Saft reported to Precision that some of its steel cans were rusty, cracked, or leaking. Saft contends that Precision breached its contract by providing defective products and then failing to adequately remedy the harm caused by the defects. Saft seeks a full refund for all defective cans, along with the costs associated with scrapping materials, lost productivity, and switching suppliers. Acuity intervened in the case to obtain a declaration that the insurance policy it issued doesn't require it to defend or indemnify Precision.

Precision moves for summary judgment on Saft's claim, Dkt. 64, and Acuity moves for summary judgment on its request for declaratory relief, Dkt. 59.[1] The court will deny both motions. Precision's contentions that it didn't breach the contract and that Saft's remedy is limited to a refund disregard the plain language of the parties' agreement. As for Acuity's

---

[1] Precision also moves for leave to file a surreply brief in opposition to Acuity's summary judgment motion, and Precision attached the brief to its motion. Dkt. 123 and Dkt. 123-1. The court will accept the brief, but it makes no difference to the outcome of Acuity's motion because the brief raises issues that the court didn't need to consider to resolve the summary judgment motion.

motion, the court concludes that Precision's insurance policy with Acuity covers at least one category of damages sought by Saft, which is all that's required to trigger the duty to defend. The court will reserve a ruling on indemnification until liability is resolved.

## BACKGROUND

The following facts are undisputed, unless otherwise noted.

Saft manufactures batteries and battery cells. One of the components of the batteries is a steel can, which Saft obtains from a supplier. From the early 2000s until 2020, Saft obtained steel cans from Precision, which purchases flat metal from Thomas Steel Strip Corporation and then shapes the metal in accordance with the customer's specifications. Precision isn't involved in creating the specifications.

The part at issue in this case is called the LM17130 steel can, which is based on a drawing that Saft provided to Precision. The drawing specified the material to be used, the finish required, the thickness of the material to be used, and the hardness of the metal, among other things.

In October 2018, Saft notified Precision that there was rust on the cans supplied by Precision. In response, Precision provided Saft with a credit for 40,000 rusted cans.

In January 2019, Saft notified Precision that cans were cracking and leaking after the batteries were assembled. Saft asked Precision to obtain information from Thomas Steel about the process it used and a potential root cause. Through the middle of 2019, new shipments that Saft received from Precision continued to include cracked and leaking cans. In April 2019, after asking a third party to investigate the cause of the cracking and leaking, Precision issued a report stating that "[n]o corrective action has been determined necessary" because there was

"no evidence of [Precision] initiated defects and the subject can complied to the requirements of [Saft's] drawing." Dkt. 67-2, at 8. Saft conducted its own internal testing, and it ruled out its processes as a contributing cause.

In May 2019, Precision representatives met with Thomas Steel representatives to further investigate the causes of the cracking and leaking. According to Thomas Steel, it informed Precision during this visit that Thomas Steel had switched its method of annealing (a heat-treatment process used to soften metal to make it more workable) from continuous coil annealing to continuous strip annealing. (The drawing that Saft provided Precision didn't specify which annealing process to use.) Precision says that it didn't become aware of the change until October 2019. Continuous coil annealing produces softer steel than continuous strip annealing. The change in Thomas Steel's annealing process coincided with the appearance of the rust, cracking, and leaking.

In October 2019, Saft informed Precision that the cans were no longer cracking and leaking. At that point, Thomas Steel had switched back to continuous coil annealing. Throughout 2019, Saft scrapped hundreds of thousands of LM17130 cans, as well as batteries and battery cells that incorporated the cans.

The court will discuss additional facts as they become relevant to the analysis.

## ANALYSIS

### A. Precision's motion for summary judgment

Saft's sole claim is that Precision breached its contract with Saft by providing defective cans and then failing to provide a full remedy. Precision denies that it breached the contract, and it contends in the alternative that Precision's remedy is limited to a refund of any defective

3

cans that Precision didn't replace. For the reasons explained below, the court rejects both contentions.

1. **Preliminary issues**

The court briefly addresses two threshold issues: (1) choice of law; and (2) the agreement or agreements that govern Saft's claim. As for choice of law, Precision assumes that Wisconsin law is controlling; Saft cites case law from both Wisconsin and North Carolina, where Saft is located. But neither side conducts a choice-of-law analysis, and neither side identifies a conflict between Wisconsin and North Carolina. "When neither party raises a conflict of law issue in a diversity case, the applicable law is that of the state in which the federal court sits." *RLI Insurance Company v. Conseco, Inc.*, 543 F.3d 384, 390 (7th Cir. 2008). So the court will apply Wisconsin law. But basic contract principles are enough to resolve Precision's summary judgment motion, so choice of law is likely unimportant.

As for the governing contract, Precision points to a document titled "General Terms and Conditions of Purchase," which was printed on the back of all the purchase orders at issue in this case. *See* Dkt. 2. The parties agree that those terms and conditions apply, but Saft says that a 2013 document called "Standard Terms and Conditions of Purchase" also applies. Dkt. 95-1.

In support of its argument that the dispute is governed solely by the terms and conditions on the back of the purchase order, Precision cites the following statement at the bottom of each purchase order: "This Purchase Order is subject to and shall be governed by the Terms and Conditions printed on the reverse hereof." Dkt. 2. Precision also cites § 1.1 of the document, which states that the terms "apply to Orders and purchases of Supplies made by SAFT from the supplier." *Id.* There is no reference in the purchase orders or any document

accompanying the purchase orders to any other terms and conditions. Saft ignores the purchase order language in its brief, and it doesn't otherwise develop an argument in support of its view that the 2013 terms and conditions document should apply. So the court will apply the terms and conditions that accompanied the purchase orders.

## 2. Breach of contract

Saft's primary contention is that Precision breached its contract by supplying steel cans that were rusty, cracked, or prone to leaking.[2] A claim for breach of contract has three elements: (1) an enforceable contract between the parties; (2) a breach of the contract; and (3) damages. *Kaste v. Amery Reg'l Med. Ctr., Inc.*, 2016 WI App 75, ¶ 9, 371 Wis. 2d 759, 886 N.W.2d 592. The parties agree that their purchase orders and order acknowledgements created enforceable contracts. But the parties dispute the second and third elements.

To show a breach, Saft relies on § 10.2 of the General Terms and Conditions of Purchase, which states that Precision "is responsible . . . for the manufacturing process" and "warrants that the Supplies . . . [a]re suited to be used for the tasks and in the manner intended" and "[c]ontain no apparent or hidden defects or malfunctions." Dkt. 95-2, at 2. Saft also relies on the expert report of Shawn Sapp, a materials scientist and analytical chemist, who opines that the defects in the cans were "the result of improper annealing parameters." Dkt. 103, at 43.

---

[2] Saft also says that Precision failed to comply with Saft's specifications that the cans be made with a #5 temper and have burr-free edges. But Saft didn't raise either of those claims in its complaint, and it's too late to amend the complaint now. *See Anderson v. Donahoe*, 699 F.3d 989, 998 (7th Cir. 2012) (complaint may not be amended through summary judgment brief). In any event, Saft doesn't allege that it gave Precision notice of those alleged breaches, as required by Wis. Stat. § 402.607(3)(a), and Saft doesn't identify any harm it suffered as a result of either alleged breach.

5

Precision neither denies that the rust and cracks are "apparent or hidden defects" within the meaning of § 10.2 nor contends that Sapp's opinion is inadmissible or insufficient to prove that the defects were caused by the manufacturing process. Instead, Precision's primary argument can be summarized as "it's not our fault." Specifically, Precision says that Saft's drawings didn't specify which annealing process to use, Precision didn't know that Thomas Steel had changed the annealing process, Precision had no reason to believe that continuous strip annealing would cause defects in the cans, and the testing performed on the steel cans before litigation didn't reveal a "definitive root cause" of the defects.

All of Precision's arguments are misplaced because fault is not the issue. Saft is asserting a claim for breach of contract, not negligence. So the important question is what Precision agreed to do. The language of the parties' agreement is clear: Precision provided a warranty that the steel cans it supplied would be free of defects caused by the manufacturing process. Precision isn't denying that the rust and cracks are defects, and it isn't challenging the sufficiency of Saft's evidence that the defects were caused by annealing, which is part of the manufacturing process. That's enough to support a breach-of-contract claim. It's simply irrelevant whether Precision's own conduct caused the defects or whether it was negligent in discovering the defects. What matters is that Precision promised Saft that it would provide steel cans without defects. And Precision points to no language in the contract that required Saft to "definitive[ly]" prove the cause of the defect before litigation.

Precision cites *United States v. Spearin* for the following rule: "[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." 248 U.S. 132, 136 (1918). Relying on this rule, Precision says that it can't be held liable for breach of contract

6

because "there is no evidence in this case to date that [it] failed to comply with Saft's specifications provided to it through that drawing." Dkt. 65, at 17. But Precision is overreading the *Spearin* rule, which is limited to situations "where the buyer *directs* the contractor to perform the contract in a particular way and the contractor does so but disaster ensues because the directions given were wrong." *Fid. & Deposit Co. of Maryland v. City of Sheboygan Falls*, 713 F.2d 1261, 1269 (7th Cir. 1983) (emphasis added) (applying Wisconsin law). In this case, it's undisputed that Saft didn't direct Precision to use continuous strip annealing. Rather, the contract left it up to Precision "[a]s an expert in its field" to direct "the manufacturing process," and Precision guaranteed "that the Supplies . . . [a]re suited to be used for the tasks and in the manner intended" and "[c]ontain no apparent or hidden defects or malfunctions." Dkt. 95-2, § 10.2. So Precision's reliance on *Spearin* is misplaced for two reasons: (1) *Spearin* doesn't apply to defects that aren't addressed by the customer's specifications, *see Morgan v. Midwest Mfg.*, 168 Wis. 2d 776, 486 N.W.2d 37 (Ct. App. 1992) (nonprecedential); and (2) *Spearin* doesn't apply when the parties' agreement expressly states that the defendant has the responsibility for the issue that caused the defect, *see Fid. & Deposit*, 713 F.2d at 1269.

If Precision believes that Thomas Steel breached a duty to provide flat metal without defects, that is a matter between Precision and Thomas Steel.[3] But any failure by Thomas Steel isn't relevant to Saft's breach-of-contract claim against Precision. Precision's contract with Saft didn't prohibit Precision from obtaining materials from a third party, but the contract kept the responsibility with Precision to provide nondefective cans.

---

[3] Precision filed a third-party complaint against Thomas Steel, Dkt. 44, but Precision later voluntarily dismissed its complaint with prejudice, Dkt. 52.

The court will deny Precision's summary judgment motion on the issue whether Precision breached its contract with Saft.

### 3. Remedies

Even if it breached the contract, Precision contends that Saft's remedies are limited to a refund for the defective cans. Saft contends that it is also entitled to incidental and consequential damages, which are allowed under the Uniform Commercial Code. *See* Wis. Stat. § 402.715. Saft seeks several kinds of consequential damages, including costs associated with scrapping the defective cans, costs associated with lost productivity, and costs associated with switching suppliers.

Precision doesn't contend that any of the types of damages sought by Saft fall outside what would ordinarily be recoverable under the UCC, so the court doesn't consider that issue. Instead, Precision says that Saft's rights are limited by § 10.5 of the contract, which states: "In case of defective or non-compliant Supplies, SAFT may (i) return them for a full refund or (ii) require repair or replacement."

Precision interprets § 10.5 as providing an exclusive remedy, but that's inconsistent with both the UCC and other parts of the contract. Under Wis. Stat. § 402.719(1)(b), "[r]esort to a remedy as provided [in a contract] is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy." Section 402.719(1)(b) "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." Wis. Stat. § 402.719, comment 2.

Section 10.5 of the contract doesn't "clearly express[]" that refund or repair is Saft's exclusive remedy. Rather, the contract uses the word "may," which is generally construed as

8

permissive. *Heritage Farms, Inc. v. Markel Ins. Co.*, 2012 WI 26, ¶ 32, 339 Wis. 2d 125, 143, 810 N.W.2d 465, 475; *see also In re Access Cardiosystems, Inc.,* 361 B.R. 626, 642–43 (Bankr. D. Mass. 2007) (use of the word "may" in remedies provision of contract supported conclusion that listed remedy was optional rather than exclusive); *Albrecht v. Fettig*, 932 N.W.2d 331, 339 (Neb. 2019) (same). Further, § 10.7 of the contract expressly states that Precision "shall compensate SAFT for any injury, material or immaterial damages, direct or indirect, suffered by SAFT due to defective or non-compliant Supplies." The only reasonable interpretation of § 10.7 is that it allows recovery of incidental and consequential damages. Precision simply ignores § 10.7, even in its reply brief after Saft relied on § 10.7 in its opposition brief. The court concludes that Saft's remedies aren't limited to a refund.

In its reply brief, Precision questions why Saft scrapped hundreds of thousands of cans, batteries, and battery cells rather than returning the cans for a refund. Dkt. 116, at 5. Precision doesn't develop a legal argument on that issue, but presumably Precision means to contend that Saft failed to mitigate its damages. Regardless, Saft says that it asked for a refund, and Precision refused to provide one. *See* Dkt. 90, ¶ 68. So the extent of Saft's damages will have to be resolved at trial.

## B. Acuity's motion for summary judgment

### 1. Overview of the claims and issues

At the time relevant to this case, Precision was covered by a Commercial General Liability and Commercial Excess Liability policy that Acuity issued. Acuity seeks a declaration that it doesn't have a duty to indemnify or defend Precision because none of the damages Saft is seeking are covered by the policy. Both sides assume that their dispute is governed by Wisconsin law.

9

Precision seeks coverage on two categories of damages claimed by Saft: (1) costs associated with lost productivity; and (2) costs associated with scrapping batteries and battery cells that incorporated the cans, which Saft says couldn't be reused after they were assembled. Acuity contends that neither category qualifies as property damage under the policy, or, if they do qualify, they are covered by exclusions related to assumption of contractual liability, damage to "your product," and damage to "impaired property."[4]

Precision has the burden to show that a category of claimed damages falls within one of the policy's coverage provisions. *See Kozlik v. Gulf Insurance Co.*, 2003 WI App 251, ¶ 8, 268 Wis. 2d 491, 673 N.W.2d 343. If Precision meets that burden, then Acuity must show that an exclusion defeats coverage. *See Ermenc v. American Family Mut. Ins. Co.*, 221 Wis. 2d 478, 481, 585 N.W.2d 679 (Ct. App. 1998). The burden shifts back to Precision to show that an exception to the exclusion applies. *See Just v. Land Reclamation, Ltd.*, 151 Wis. 2d 593, 605, 445 N.W.2d 683, 688 (Ct. App. 1989), *rev'd on other grounds*, 155 Wis. 2d 737, 456 N.W.2d 570 (1990). In a situation like this one in which the insurer is providing a defense under a reservation of rights, the court may consider both the allegations in the complaint and subsequently developed evidence in determining the scope of the insurer's duties. *See Olson v. Farrar*, 2012 WI 3, ¶34, 338 Wis. 2d 215, 809 N.W.2d 1.

The court concludes that the policy provides coverage for the costs associated with lost productivity and that none of the exclusions apply. If even one type of claimed damages is

---

[4] Acuity also cites an exclusion for damage to "your work" in the event that Precision contends that Saft's damages were caused by defective service rather than a defective product. Dkt. 68, at 25. But Precision expressly states that "the Your Work Exclusion is facially inapplicable because the PDM Cans were PDM's product, not its work." Dkt. 84, at 26. Acuity doesn't challenge that view in its reply brief, so the court need not consider the exclusion for "your work."

covered by the policy, Acuity's duty to defend is triggered. *See Fireman's Fund Insurance Co. v. Bradley Corp.*, 2003 WI 33, ¶ 21, 261 Wis. 2d 4, 660 N.W.2d 666. So Acuity has a duty to defend Precision regardless of whether the policy covers any of Saft's scrapping costs, making it unnecessary to decide now whether there is coverage for scrapping costs.[5] Acuity is also seeking a declaration on its duty to indemnify, but the court will reserve a ruling on that issue until liability is resolved. *Hy Cite Corp. v. Regal Ware, Inc.*, No. 10-cv-168-wmc, 2011 WL 13359304, at *1 (W.D. Wis. June 8, 2011) ("[T]he Seventh Circuit generally warns against deciding indemnification before liability has been established.").

### 2. Grant of coverage

Saft's complaint seeks damages for "the costs associated with production downtime." Dkt. 1, ¶ 32. Saft's corporate representative and purchasing manager later explained that those damages are based on an 87-day production line stoppage that occurred because the company didn't "hav[e] product to run." Dkt. 120, ¶¶ 56, 68. In other words, Saft alleges that it didn't have the materials needed to make batteries because Precision's cans were defective, and it didn't have an alternative supplier at the time.

The policy covers accidental "bodily injury" and "property damage." "Bodily injury" is not at issue. So the threshold coverage question is whether Saft is seeking compensation for "property damage" within the meaning of the policy. The policy has a two-part definition of property damage:

---

[5] The key dispute regarding coverage for the scrapping costs is whether damage to the batteries qualifies as damage to "other property" or simply damage to the cans themselves as part of an "integrated system." The meaning and scope of an integrated system is an issue before the Wisconsin Supreme Court in *5 Walworth, LLC v. Engerman Contracting, Inc.*, 2019AP1085 and 2019AP1086 (Wis. Jan. 11, 2022) (granting petition for review). In light of the uncertainty in the law on that issue, the court will focus on the lost productivity costs.

>17. "Property damage" means:
>
>>a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>>
>>b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the occurrence that caused it.

Dkt. 62-1, at 21.

Saft's production line is tangible property that was not physically injured. By virtue of Precisions defective cans, Saft lost the use of the production line until it could obtain nondefective steel cans. Lost production time caused by a defective product can qualify as a "[l]oss of use of tangible property that is not physically injured."

Precision supports this interpretation with three cases in which a court applying Wisconsin law held that similar policy language covered damages for production property that was "rendered unusable" by a defective product. In *Sola Basic Industries, Inc. v. U. S. Fidelity & Guaranty Co.*, 90 Wis. 2d 641, 280 N.W.2d 211 (1979), the plaintiff alleged that it couldn't operate its electric furnaces while a defective transformer was out for repairs. In *West Casualty & Surety Co. v. Budrus*, 112 Wis. 2d 348, 332 N.W.2d 837 (Ct. App. 1983), a farmer lost use of some of his fields for a season because some of the seeds he used were mislabeled as a type of seed he couldn't use. And in *American Motorists Insurance Co. v. Trane Co.*, 718 F.2d 842 (7th Cir. 1983), the plaintiff alleged that its plant couldn't operate at full capacity because of a defective heat exchanger. In each case, the court held that the loss of use was covered as a form of "property damage."

Acuity argues that economic damages that "flow solely" from excluded property damage aren't covered. Dkt. 68, at 22. Acuity is correct that property damage to Precision's products,

that is the steel cans themselves, is expressly excluded under § 2.k. of the policy. But Acuity doesn't point to any language in the policy that supports a general exclusion of coverage for economic damages that "flow" from defects in Precision's products. Nor can that idea be squared with the cases cited in the previous paragraph.

The cases cited by Acuity don't support the point either. *Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.*, 2000 WI 26, ¶ 54, 233 Wis. 2d 314, 342, 607 N.W.2d 276, 289, held that there was no coverage under the policy because the claimed profits did not arise from the loss of use of any property. Similarly, in *Trio's, Inc. v. Jones Sign Co.*, 151 Wis. 2d 380, 384, 444 N.W.2d 443, 445 (Ct. App. 1989), the court held that a restaurant owner did not lose the use of his restaurant when a malfunctioning sign led to decreased business. The lack of a functioning sign made it harder to attract business, but it didn't prevent use of the building.[6]

The court concludes that Saft's alleged damages for lost production time qualify as a loss of use. Acuity did not timely assert any other arguments regarding the loss-of-use provision,[7] so the court concludes that the policy grants coverage for lost production time. The next issue is whether any exclusions would apply to negate coverage.

---

[6] Acuity also cites *Nu-Pak, Inc. v. Wine Specialties International, Ltd.*, 2002 WI App 92, 253 Wis. 2d 825, 643 N.W.2d 848. *Nu-Pak* is unhelpful because it didn't involve the "loss of use" provision.

[7] In its reply brief, Acuity includes a sentence that the lost production costs aren't covered because "Saft has not alleged that the defective battery cans caused an accident, that its production lines were 'rendered useless,' that its facility diminished in value, or that it had to incur other costs to keep the production lines running." Dkt. 122, at 5. Acuity doesn't tie any of these contentions to policy language or case law, and it doesn't otherwise develop the contentions into arguments, so the court concludes that any arguments based on the contentions are forfeited for the purpose of its summary judgment motion. *See Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 306 (7th Cir. 2020) (party forfeited argument by failing to

### 3. Exclusions

#### a. Contractually assumed liability exclusion

The policy contains an exclusion for "property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." This type of exclusion "applies where the insured has contractually assumed the liability of a third party, as in an indemnification or hold harmless agreement; it does not operate to exclude coverage for any and all liabilities to which the insured is exposed under the terms of the contracts it makes generally." *Am. Fam. Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 58, 268 Wis. 2d 16, 47–48, 673 N.W.2d 65, 80–81. In other words, the exclusion isn't triggered simply because a claim is based on a breach of contract. Rather, Acuity must show that Precision is responsible for the damages at issue because Precision assumed the liability of a third party. The purpose of the exclusion is to prevent an insured from creating coverage through an agreement entered into "after the insurance is in force and the liability is a certainty." *Id.* at ¶ 59.

Acuity contends that the exclusion applies because Saft's complaint cites the following two provisions in the agreement between Saft and Precision:

> 10.7 The supplier shall compensate SAFT for any injury, material or immaterial damages, direct or indirect, suffered by SAFT due to defective or non-compliant Supplies.
>
> . . .
>
> 12.1 The supplier is responsible for any damage or loss suffered by SAFT or a third party due to failure to fulfill or inadequate fulfillment of the Order. Accordingly, the supplier shall compensate SAFT for all prejudices suffered and hold SAFT harmless against all third party claims.

---

cite authority and including "only one sentence of justification" for the argument).

Dkt. 1, ¶ 15.

Neither of these provisions trigger the contractually assumed liability exclusion under the circumstance of this case. Section 10.7 requires Precision to compensate Saft for damages, but it doesn't "assum[e] the liability of a third party," so that provision of the contract isn't covered by the exclusion. Section 12.1 *does* make Precision liable for claims by third parties, but Acuity doesn't explain the relevance of that part of § 12.1 to the category of damages at issue. Saft's claimed damages for lost production aren't based on an indemnity agreement or the claim of a third party. Rather, Saft is seeking compensation for its *own* damages based on Precision's alleged failure to comply with its obligation to provide nondefective steel cans. The type of claim to which the exclusion applies simply isn't at issue. So Acuity isn't entitled to summary judgment based on the contractually-assumed liability exclusion.

### b. Damage-to-your-product exclusion

The policy contains an exclusion for "[p]roperty damage to your product arising out of it or any part of it." Acuity's only argument for applying this exclusion to Saft's lost productivity is the same as Acuity's argument for finding no coverage under the provision for "loss of use of tangible property that is not physically injured." Specifically, Acuity says that loss of use doesn't qualify as property damage because the loss of use "flow[s]" from the insured's product. Dkt. 68, at 25. The court already rejected this argument, and Acuity doesn't identify any new reasons to support the argument in the context of this exclusion. So Acuity isn't entitled to summary judgment based on the damage-to-your-product exclusion.

### c. Impaired property exclusion

The policy excludes damage to "impaired property" or "property that has not been physically injured" that arises from defects in Precision's products or from Precision's failure

15

to perform under a contract. Dkt. 62-1, at 10–11. The court will assume for the purpose of Acuity's summary judgment motion that the initial requirements for the exclusion are met. But Precision contends than an exception to the exclusion applies. Specifically, there is an exception for "the loss of use of other property arising out of sudden and accidental physical injury to your product or your work after it has been put to its intended use." *Id*.

Acuity doesn't dispute that the loss of the production lines arose out of a sudden and accidental physical injury to the steel cans, so the court doesn't consider that issue. Rather, Acuity's only contention based on this exception to the exclusion is that the injury didn't occur after the steel cans were put to their "intended use." Precision says that the exception applies because the "intended use" of the steel cans was to be assembled into a battery unit, and the cans didn't crack and leak until after they were assembled. Dkt. 84, at 14. Acuity doesn't challenge Precision's allegation that the cans failed only after assembly. Rather, Acuity argues that the "full" intended use of the cans was "to be sold to Saft's customers," and this use was never realized "because the finished battery units were scrapped before ever being sent to the end customer." Dkt. 122, at 11.

The policy doesn't define the phrase "intended use," and neither party cites any case law from Wisconsin or anywhere else regarding the meaning of the phrase. But the court in *Washington Energy Co. v. Century Surety Co.*, considered the issue and noted the ambiguity of the phrase:

> The phrase "after it has been put to its intended use" is likewise uncertain. Is the application of this term limited to "use" by someone else after completion and/or occupation? Or, does it simply mean any time work on the particular part of "your product" or "your work" has progressed to the point that it is performing its "use," at least to some extent, before it is suddenly and accidentally physically injured? . . . The insured should be favored by a broad reading of "after it has been put to its intended

16

> use." Therefore, the broadest and most expansive construction of that term as is reasonable should be applied.

407 F. Supp. 2d 680, 699 (W.D. Pa. 2005) (quoting Scott C. Turner, *Insurance Coverage of Construction Disputes* § 26.26 (June 2005)).

The court agrees with *Washington Energy* that the phrase "intended use" is ambiguous. Acuity is correct that the "finished battery units" weren't used as intended, but the "finished battery unit" isn't Precision's product, the steel cans are. One reasonable view is that the can isn't serving a purpose until it is used by a consumer as an assembled battery, so that is the can's intended use. But it would also be reasonable to say that the intended use of the cans was to make a battery, and once that use was accomplished, any further uses were of the battery as an assembled product, and not the steel can itself.

The ambiguity in the phrase means that Precision prevails. Courts must construe an ambiguous clause in an insurance policy in favor of the insured. *Folkman v. Quamme*, 2003 WI 116, ¶ 13, 264 Wis. 2d 617, 631, 665 N.W.2d 857, 864. In this case, one reasonable understanding of the "intended use" of a component part is to be assembled into the final product. And this understanding is consistent with one of the general purposes of commercial general liability policies, which is to provide coverage when the insured's product causes damage to the property of another. *See Wisconsin Label*, 2000 Wis. 26, at ¶ 44. Reading the exception as narrowly as Acuity proposes would undermine one main purpose of the policy. It's undisputed for the purpose of summary judgment that the steel cans failed after they were assembled into Saft's batteries. So the court concludes that the exception to the impaired-property exclusion applies and that Acuity isn't entitled to summary judgment on the impaired-property exclusion.

ORDER

IT IS ORDERED that:

1. Defendant Precision Drawn Materials, Inc.'s motion for summary judgment, Dkt. 64, is DENIED.

2. Defendant Acuity's motion for summary judgment, Dkt. 59, is DENIED.

3. Precision's motion for leave to file a surreply brief, Dkt. 123, is GRANTED.

Entered August 17, 2022.

                          BY THE COURT:

                          /s/

                          _____

                          JAMES D. PETERSON
                          District Judge